UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Paul L. Murphy,               :
          Plaintiff,          :
                              :
     v.                       :     File No. 1:04-CV-71
                              :
Correctional Medical          :
Services, Cathy Bean,         :
Nurse Jim, Dr. Kozub,         :
Dr. Kutler, Nurse Lena,       :
Nurse Patty,  Nurse           :
Manager Sharon, Dr. Birge,    :
          Defendants.         :

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Papers 112, 118, 122, 127, 133, 135, 136 and 138)

Plaintiff Paul Murphy, a Vermont inmate proceeding
*pro se*, claims that he has not received adequate medical
care while in prison.  In his initial complaint, Murphy
alleged that he was deprived of his inhaler for 18 days,
that hand x-rays and a blood draw had been prescribed but
not performed, and that he suffered a seizure as a direct
result of the fact that his blood levels were not being
monitored.  (Paper 6).  Murphy subsequently amended his
complaint to add allegations regarding an eye injury, a
hernia, and additional facts about his hand injury.
(Paper 10).  Murphy explained in his amended complaint
that the eye injury is not expected to result in a loss
of vision, and that surgery was eventually performed on

his hernia.  Subsequent amendments to the complaint have
not added any substantive claims.  (Papers 65 and 71).

Currently pending before the Court is a series of
motions, including the defendants' motion for summary
judgment (Paper 112).  In their motion for summary
judgment, the defendants argue that Murphy's claims do
not amount to state law negligence.  The defendants have
included with their motion affidavits from two of
Murphy's treating physicians.  The physicians' affidavits
at times contradict Murphy's general allegations, but
mostly discuss his treatment in greater detail as set
forth below.  The remaining motions include Murphy's
requests for hearings and additional discovery, as well
as the defendants' motion to quash a subpoena.  Discovery
in this case is currently closed, and the case has been
ordered to be ready for trial as of January 2, 2006.
(Paper 109).  For the reasons set forth below, I
recommend that the defendants' motion for summary
judgment be GRANTED, and all remaining motions are
DENIED.

## Factual Background

In his initial complaint, Murphy claimed that

2

medical personnel deprived him of his inhaler for a period of 18 days. (Paper 6). Specifically, Murphy claimed that on February 27, 2004 he alerted "Nurse Jim" that his inhaler was empty and that he needed a new one. On March 12, 2004, Murphy had not yet received the new inhaler and allegedly suffered an asthma attack. Murphy received a new inhaler on March 17, 2004. <u>Id.</u>

Murphy also alleged that "there have been orders for blood to be drawn that was never done." As a result of the alleged failure to monitor his blood levels, Murphy suffered a seizure on March 18, 2004. Murphy further claimed that "x-rays for my hand were never done," but did not explain why such x-rays were required. <u>Id.</u>

Six days after filing his initial complaint, Murphy submitted an amended complaint. (Paper 7). The amended complaint included claims of inadequate medical care with respect to eye and hand injuries, as well as inadequate treatment of a hernia. (Papers 7 and 10). The eye injury was suffered when cleaning powder allegedly entered Murphy's left eye. Two days later, doctors allegedly diagnosed the injury as "pink eye." The amended complaint claims that a specialist at Fletcher

3

Allen Medical Center subsequently diagnosed the problem
as a burn, informed Murphy that the eye was healing, and
said that he should not expect any loss of vision.

Murphy's hand injury came after he punched the door
of his cell on April 3, 2004.  Murphy sought medical
attention, but was allegedly told that nothing could be
done until the swelling went down.  Murphy claims that
the defendants were negligent in not obtaining x-rays
immediately.

With respect to the hernia claim, Murphy states that
he first noticed a "bulge" in his stomach on September
20, 2003.  He suffered pain in that area through the rest
of 2003, and his grievances for treatment allegedly went
unanswered.  Murphy received surgery for his hernia on
January 13, 2004.

In support of their motion for summary judgment, the
defendants have submitted affidavits from Dr. William
Birge and Dr. David Lawlor.  Dr. Birge's affidavit states
that he treated Murphy in prison, and that he has
reviewed 928 pages of Murphy's medical records.  Those
records allegedly reveal, *inter alia*, a significant
psychiatric history including depression, schizophrenia,

and antisocial personality.[1]  Relevant to the facts of
this case, Dr. Birge notes that Murphy has a history of
aggression toward himself, as evidenced by the hand
injury suffered after punching his cell door.  "The
plaintiff's hand x-ray following his documented punching
of a wall disclosed no new fracture; however it does note
a small calcification suggestive of an old boxer's
fracture.  Treatment is conservative in most cases."

    With respect to Murphy's alleged asthma attack, Dr.
Birge concedes that Murphy "has a diagnosis of asthma."
He also states that Murphy's inhaler was replaced at one
point by a device "using an alternative delivery system."
Birge notes that Murphy has refused his asthma medication
in the past "without exacerbation of his breathing
problem."  Dr. Birge saw nothing in the records showing
an acute attack resulting from Murphy's inability to

---

    [1]  Murphy has moved to dismiss the Birge affidavit on
the ground that Birge "is not a mental health doctor and
should not be diagnosing mental health records that is
[sic] out of his proper training."  (Paper 122).
Murphy's mental health history is not material to his
claims or to the disposition of the defendants' summary
judgment motion.  The Court will, therefore, accept this
information merely as background, and consider the
remainder of Birge's affidavit testimony as it pertains
directly to Murphy's claims.  The motion to dismiss
Birge's affidavit (Paper 122), construed as a motion to
strike, is DENIED.

access his inhaler.

Dr. Birge also concludes, based upon his review of
the medical records, that Murphy "was evaluated on a
timely basis for his hernia by multiple clinicians who
determined that the appropriate course would be watchful
waiting and likely elective repair of the ventral
defect."  Dr. Birge explains that emergency surgery is
required only when the hernia compromises blood supply.
In this case, Murphy was "found to have intact bowel
sounds, normal or nearly normal bowel function, normal
vital signs, normal labs on all visits, all leading the
clinician to a diagnosis of abdominal pain without
vascular compromise."  The hernia was eventually treated
surgically, and according to Dr. Birge the surgery
confirmed that there were no "chronic changes to the
bowel that would indicate prior vascular insult."  After
surgery, it was explained to Murphy that there would be
pain, and in Dr. Birge's opinion this pain was properly
treated.

Dr. Lawlor's affidavit addresses Murphy's eye
injury.  Dr. Lawlor, an ophthalmologist, is presumably
the specialist at Fletcher Allen whom Murphy quoted in

his amended complaint.  Dr. Lawlor saw Murphy nine days after the injury was incurred, and concluded that Murphy had "chemical conjunctivitis and a chemical karatitis." Dr. Murphy had been taking the antibiotic gentamicin for his injury, but Lawlor prescribed a different antibiotic to which Murphy responded positively and made a full recovery.

Dr. Lawlor further testifies that he was not present when the accident happened and therefore cannot testify about the propriety of Murphy's immediate care. "Assuming that Mr. Murphy's left eye was not flushed out immediately after the accident, it is difficult for me to speculate as to what difference it would have made to Mr. Murphy's left eye had the eye been flushed out immediately after the accident."  Having said this, Dr. Lawlor nonetheless concludes that "because Mr. Murphy appears to have made a full recovery, it is my opinion to a reasonable degree of medical certainty that flushing of the eye immediately after the accident would <u>not</u> have made a difference in Mr. Murphy's ultimate outcome." (Emphasis in original).

In response to the Birge and Lawlor affidavits,

7

Murphy has submitted his own affidavit.  Most of the
affidavit focuses on Dr. Birge's discussion of Murphy's
mental health history, which Murphy asserts is not at
issue in this case.  Murphy also insists that although
Dr. Birge found no record of an asthma attack, the attack
did occur.

   With respect to his hernia, Murphy contends that he
suffered pain from September through December, 2003, that
he did not receive pain medication during that time, and
that "pain is actionable even though there was no
permanent injury."  As to his eye injury, Murphy explains
that he had severe pain in his eye, and that the injury
did not improve until he was taken to the emergency room
two days after the incident.  "Dr. Lawlors [sic]
affidavit states basically that if they had treated me
right away it would not have changed the outcome but it
does not say that I did not suffer pain before being
treated."  (Paper 131).

   In a supplemental filing, Murphy alleges that he was
initially given a bottle of sterile water drops to clean
his eye, and that he was denied access to the eye
station.  Murphy also reiterates his initial claim that

8

he suffered a seizure as a result of a failure by health care providers to monitor his blood levels.  Finally, Murphy states that he "was having a real hard time emotionally because mental health refused to change my meds at the time."  (Paper 137).

Discussion

I.  <u>Summary Judgment Standard</u>

    Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Gallo v. Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." <u>Gallo</u>, 22 F.3d at 1224.

9

Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence would be insufficient to carry the non-movant's burden of proof at trial.  Celotex, 477 U.S. at 322-23.  If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

II.  Claims Of Inadequate Medical Care

The defendants argue that Murphy's claims do not rise to the level of negligence under Vermont law. Murphy's claims, however, are brought pursuant to the Eighth Amendment.  (Paper 65).  Therefore, the appropriate inquiry is whether the record presents issues of triable fact with respect to potential constitutional violations.

To prove constitutionally inadequate medical care, Murphy must show that the defendants were deliberately indifferent to the substantial risk that he would suffer serious harm.  See Farmer v. Brennan, 511 U.S. 825, 828 (1994).  Murphy must support his claim with evidence that his condition was so serious that "a condition of urgency, one that may produce death, degeneration, or extreme pain exists," and that the defendants were deliberately indifferent to that condition.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

The standard for determining whether a prisoner was

11

deprived of his constitutional right to adequate medical
care therefore embodies both an objective and a
subjective prong.  First, the alleged deprivation must
be, in objective terms, "sufficiently serious."  Hathaway
v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  Second, the
official must act with a sufficiently culpable state of
mind.  Id.  In assessing whether a prisoner had a serious
medical need, a court may consider the absence of
"concrete medical injury."  Smith v. Carpenter, 316 F.3d
178, 189 (2d Cir. 2003); see also Hill v. Dekalb Regional
Youth Detention Ctr., 49 F.3d 1176, 1188 (11th Cir. 1994),
abrogated on other grounds by Hope v. Pelzer, 536 U.S.
730, 739 (2002) ("An inmate who complains that delay in
medical treatment rose to a constitutional violation must
place verifying medical evidence in the record to
establish the detrimental effect of the delay in the
medical treatment to succeed."); R.T. v. Gross, 298 F.
Supp. 2d 289, 295 (N.D.N.Y. 2003).

     A prisoner must also demonstrate more than "an
inadvertent failure to provide adequate medical care" by
prison officials.  See Estelle v. Gamble, 429 U.S. 97,
105-06 (1976).  Indeed, deliberate indifference requires

more than negligence, but less than conduct undertaken

for the very purpose of causing harm.  See Farmer, 511

U.S. at 836.  "This principle may cover a delay in

treatment based on a bad diagnosis or erroneous calculus

of risks and costs, or a mistaken decision not to treat

based on an erroneous view that the condition is benign

or trivial or hopeless, or that treatment is unreliable,

or that the cure is as risky or painful or bad as the

malady."  Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir.

2000).  Mere disagreement over proper treatment does not

create a constitutional claim.  Chance v. Armstrong, 143

F.3d 698, 703 (2d Cir. 1998).

The facts of this case, viewed in a light most

favorable to Murphy, do not rise to the level of

constitutionally inadequate medical care.  Murphy's first

claim is that he was denied access to his inhaler for 18

days.  Although the defendants assert that there is no

record of an asthma attack during this time, they have

not directly disputed Murphy's claims that he did, in

fact, suffer an attack.

While the failure to treat an inmate's asthma may

not implicate the Eighth Amendment, "an actual asthma

13

attack, depending on the severity, may be a serious medical condition." Scott v. DelSignore, 2005 WL 425473, at *9 (W.D.N.Y. Feb. 18, 2005); see also Patterson v. Lilley, 2003 WL 21507345, at *3-4 (S.D.N.Y. June 30, 2003). Here, Murphy has not provided any evidence about the severity of his attack. See Reyes v. Corrections Officer Bay, 1999 WL 681490, at *2 (S.D.N.Y. Sept.1, 1999) (claim dismissed where asthma attack was not sufficiently serious). Nor has he claimed that he received inadequate treatment at the time of his asthma attack. Indeed, the evidence before the Court shows only that Murphy experienced an attack, and that this attack may have been caused by the deprivation of access to an inhaler. Without more, this claim is insufficient.

A similar claim was brought in Patterson, where an inmate with an asthmatic condition was denied access to his daily asthma medication upon arriving at a correctional facility. 2003 WL 21507345, at *1. The inmate experienced an asthma attack the next morning, and was treated for his attack. Id. When the inmate sued prison officials, the court held that because the inmate was not denied treatment at the time of his attack, the

14

objective prong of the deliberate indifference test had
not been met.  <u>Id.</u> at *4.  Other cases have also
illustrated the critical difference between claims
asserting a failure to medicate a generalized asthma
condition, and claims that assert a failure to treat an
asthma attack.  <u>Compare</u> <u>Ennis v. Davies</u>, 1990 WL 121527
(S.D.N.Y. Aug. 15, 1990) (denying defendants' motion for
summary judgment based on prison official's refusal to
provide inmate with his asthma medication during an
actual asthma attack), <u>with</u> <u>Sulkowska v. City of New
York</u>, 129 F. Supp. 2d 274 (S.D.N.Y. 2001) (defendant's
denial of pretrial detainee's asthma medication, in the
absence of an asthma attack, amounted to nothing more
than mere negligence and did not satisfy objective prong
of deliberate indifference test).

Furthermore, Murphy has provided no evidence that
the defendants were deliberately indifferent to a serious
risk of harm.  Dr. Birge's affidavit establishes that
Murphy showed normal respiratory and pulse rates, and
normal pulse oximetry.  He had refused his medication in
the past without exacerbating his breathing problems.  In
other words, there was little indication that Murphy was

on the verge of an asthma attack.  Without knowledge of a
likely attack, the defendants could not have been
deliberately indifferent to his need for medication.  <u>See</u>
<u>Scott v. DelSignore</u>, 2005 WL 425473, at *10 (W.D.N.Y.
Feb. 18, 2005) (no deliberate indifference where record
was "devoid of any indication that Scott was on the verge
of experiencing an asthma attack").  For these reasons,
Murphy's Eighth Amendment claim with respect to his
asthma attack should be DISMISSED.

Murphy's next claim is that he suffered a seizure as
result of the defendants' failure to monitor his blood
levels.  As with his asthma claim, this claim is missing
critical facts.  Nowhere in his multiple amended
complaints or affidavits does Murphy explain the need for
blood monitoring, or how the lack of monitoring resulting
in a seizure.  Nor does Murphy provide any details about
the seriousness of his seizure.  With respect to his
seizures in general, Murphy has stated that he loses "a
few minutes of time and pass[es] out."  (Paper 131 at 2).
Murphy's filings are similarly lacking any allegation
that the defendants knew of a likelihood of seizure, and
deliberately failed to provide treatment.  While a

charitable reading of Murphy's allegations might find support for a negligence claim for failure to monitor his blood levels, the allegations fall far short of showing deliberate indifference to a substantial risk of serious harm.

Murphy's allegations with respect to his hand injury are somewhat more detailed.  In his first amended complaint (Paper 10), Murphy states that after he injured his hand punching his cell door, Nurse Lena cleaned the wound and put ointment on the broken skin.  Murphy's hand then became painful and swollen, and Nurse Lena brought him ice.  Murphy requested an x-ray, but was told that an x-ray could not be performed until the swelling went down.  Murphy then filed suit for the failure to take him to x-ray immediately.

Dr. Birge's affidavit indicates that Murphy's hand was eventually x-rayed, and that the x-ray showed no new fracture, just "a small calcification suggestive of an old boxer's fracture.  Treatment is conservative in most cases." (Paper 119 at 2).  There is no evidence to show that the x-ray was unreasonably delayed, or that a failure to provide an immediate x-ray caused additional

17

harm.  Further, as with Murphy's other claims, there is nothing in the record indicating deliberate indifference. In fact, Murphy's own allegations suggest that he received immediate care from Nurse Lena, and that the timing of the x-ray was simply a subject of disagreement between Murphy and his care providers.  As discussed above, a disagreement about the proper course of treatment does not rise to the level of a constitutional claim.  See Chance, 143 F.3d at 703.  This claim should, therefore, be DISMISSED.

Murphy's hernia claim is that he suffered pain for approximately three months before he was given pain medication.  Dr. Birge's affidavit addresses this issue. "While narcotic pain relievers reduce discomfort, they also slow the bowel and obscure the clinical diagnosis." (Paper 119 at 4).  Dr. Birge also states, based upon his review of Murphy's medical records, that "[t]his plaintiff was treated in an appropriate manner, and his surgical defect was repaired.  In my opinion, plaintiff's medical care for his hernia met the standard of care in all respects including the nature of treatment and its timing."  Id. at 5-6.

Again, the pain medication issue appears to be, at most, a disagreement about treatment.  Murphy's pain may also have been exacerbated by his extended refusal in late 2003 to take his medication.  The Court's review of Murphy's medical records shows that he was seen for his hernia on September 21, 2003.[2]  Complaints of pain after that time do not appear in the record until October 15, 2003, when Murphy reported increasing tenderness and bulging.  As a result of this complaint, the medical staff recommended a surgical consult for evaluation and treatment.

Murphy was seen for abdominal pain again on November 3, 2003, and the recommendation was a high fiber diet. One week later, on November 10, 2003, a member of the medical staff reported that Murphy's "hernia has been manipulated and reduced with only short term relief."  On November 14, 2003, doctors added medication to treat increased stomach acid and provided Murphy with a belt, or "binder," to support his hernia.

As of November 15, 2003, the records reflect that Murphy was refusing all of his medications except for his

_____

[2]  Medical records were provided to the Court pursuant to its order dated December 6, 2004.

19

seizure medication.  On November 17, 2003, in a meeting
with a psychiatrist, Murphy would not explain his reasons
for refusing his medications.  A psychiatric report dated
November 21, 2003 stated that Murphy was continuing to
refuse his medications, and in a letter to "Alice" dated
November 28, 2002, Murphy himself wrote that "I stopped
taking my meds a few weeks ago."

On December 7, 2003, Murphy wrote to his
psychiatrist that "I am stopping eating as well as
drinking starting 12-8-03 and I will not stop this time."
In a separate complaint to prison medical providers, also
dated December 7, 2003, Murphy stated that "I'm tired of
being in pain with this hernia in my stomach.  I can't
take it anymore and refuse to put up with it any longer."
When questioned about his pain, Murphy reported that the
belt was helping but that it "digs into me."  Padding was
provided for belt, and Murphy was told to report
increased symptoms immediately.  A meeting with a
physician was set for December 10, 2003.

On December 9, 2003, Murphy was given a heat pack
and allowed either Motrin or Tylenol for his pain.
Tylenol was again prescribed after his session with a

20

doctor on December 10, 2003, and was provided to him on December 12 and 17, 2003. On December 24, 2003, after "increasing complaints" of pain, Murphy was prescribed a narcotic and metamucil. Murphy's complaint concedes that in "approx [sic] December the doctor put me on pain meds."

Based upon these records, it appears that Murphy received medical attention for his hernia throughout the fall of 2003, and that the treatments provided were commensurate with his pain level. When Murphy complained of tenderness, the treatment was conservative. When he continued to complain of pain, medication was prescribed accordingly. Nothing in the record evidences a deliberate indifference to Murphy's suffering. I therefore recommend that Murphy's claim of hernia-related pain be DENIED.

Murphy's last claim is that his eye injury was not treated properly. Specifically, Murphy contends that the diagnosis of "pink eye" was mistaken, and that the medication provided to him was ineffective. Murphy was provided sterile drops to rinse his eye, but was allegedly denied access to the "eye station." After two

21

days of no improvement, Murphy was taken to the emergency
room.  Murphy's medical records show that emergency room
staff diagnosed him as having conjunctivitis with signs
of an "alkali burn."  For treatment, Murphy was
prescribed an antibiotic in the form of an ointment.  The
instructions for the ointment characterized the treatment
as being for "conjunctivitis, commonly known as 'pink
eye.'"

In response to Murphy's claims, the defendants have
provided Dr. Lawlor's affidavit.  (Paper 115).  As
discussed above, Dr. Lawlor treated Murphy several days
after the visit to the emergency room.  Dr. Lawlor noted
"inflammation to the conjunctiva" and "a mild corneal
irritation."  Dr. Lawlor's diagnosis was "chemical
conjunctivitis and a chemical keratitis," for which he
prescribed a different antibiotic than the one prescribed
by the emergency room staff.  Dr. Lawlor also states that
flushing the eye immediately after the incident would,
"to a reasonable degree of certainty," not have made any
difference to Murphy's recovery.  Murphy made a full
recovery from his eye injury.

Murphy seeks to collect damages for pain he

22

allegedly suffered in the days before he received the correct treatment. As with some of Murphy's other claims, his evidence might be sufficient to show negligence, but falls short of showing a constitutional violation. The original treatment provided to Murphy was not effective. Murphy was denied access to the "eye station," but Dr. Lawlor's undisputed testimony is that additional flushing would not have altered the outcome. Although Murphy, with support from Dr. Lawlor, challenges the "pink eye" diagnosis, the medical records and Dr. Lawlor's affidavit each reference inflammation of the conjunctiva. Furthermore, even if the Court assumes that "pink eye" was a misdiagnosis, misdiagnosis alone does not violate the constitution. See Harrison, 219 F.3d at 139. Once it became apparent that the treatment was not working, Murphy was quickly provided alternate care by providers outside of prison, and his problem was soon brought under control. Given these facts, this Court should not find that the defendants were deliberately indifferent to Murphy's needs with respect to his eye injury, and this claim should be DISMISSED.

III.  Remaining Motions

Because I am recommending the dismissal of Murphy's claims, his requests for hearings and a jury trial (Papers 118 and 133) are moot.  Also pending before the Court is the defendants' motion to quash one of Murphy's subpoenas.  (Paper 127).  The subpoena reportedly seeks log records for two units at the Northwestern State Correctional Facility.  In support of their motion to quash, the defendants have included an affidavit from a supervisor at the facility stating that the requested records contain information on security procedures and inmate movements.  The defendants also argue improper service and object on relevance grounds.  For the reasons set forth in the defendants' motion, the motion to quash is GRANTED.

In recent weeks Murphy has filed a motion to compel the production of his medical records (Paper 135).  He has also filed a motion for a subpoena so that he can obtain his medical records from the Department of Corrections, along with "any correspondence within Dept of Corrections and Correctional Medical Services." (Paper 136).  The most recent motion in the case is Murphy's motion to take the depositions of 13

individuals.  (Paper 138).

   In a filing dated August 16, 2005, Murphy explicitly
waived his right to any further discovery, suggesting
that he would be basing his claims upon his medical
records and that any further discovery would favor the
defendants.  (Paper 101).  Accordingly, the Court ordered
that discovery was closed, and set a deadline of October
15, 2005 for filing motions.  (Paper 109).  The
defendants submitted their motion for summary judgment on
October 14, 2005.

   Furthermore, the Court has already ordered, on two
occasions (Papers 39 and 109), that Murphy's medical
records be provided to him.  Murphy claims that in the
course of his prison transfers he has lost his documents.
In a letter dated January 10, 2006, counsel for the
defendants invited Murphy to narrow his request, but
nonetheless offered to provide Murphy with another set of
medical records.  (Paper 140-3).  Given that discovery
has been closed at Murphy's urging, his discovery-related
motions for documents, depositions and a subpoena are
DENIED.  Consistent with this Court's prior orders,
however, the defendants shall once again provide Murphy

25

with a copy of his medical records for time periods that
are relevant to this case.

## Conclusion

For the reasons set forth above, I recommend that
the defendants' motion for summary judgment (Paper 112)
be GRANTED, and that this case be DISMISSED.  The
defendants' motion to quash (Paper 127) is GRANTED, and
Murphy's motions for hearings (Papers 118 and 133), trial
(Paper 133), additional discovery (Papers 135, 136 and
138) and to strike the Birge affidavit (Paper 122) are
DENIED.

Dated at Burlington, in the District of Vermont,
this 30th day of January, 2006.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge


Any party may object to this Report and Recommendation
within 10 days after service by filing with the clerk of
the court and serving on the magistrate judge and all
parties, written objections which shall specifically
identify the portions of the proposed findings,
recommendations or report to which objection is made and
the basis for such objections.  Failure to file objections
within the specified time waives the right to appeal the
District Court's order.  See Local Rules 72.1, 72.3, 73.1;
28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and
6(e).